## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 21-22222-CIV-ALTMAN/Reid

**PALMER WILLIAMS III**,

      *Plaintiff*,

*v.*

**GREGORY MALLET**, *et al.*,

      *Defendants.*

_____/

### <u>ORDER</u>

Nearly six years ago, the Defendants—Officers Mallet and Prince of the Miami-Dade Police Department—arrested the Plaintiff, Palmer Williams III, for (what they believed was) the burglary of a car. When Williams resisted, the Officers responded with force, leaving Williams with a ruptured eye and long-term vision loss. After the state declined to prosecute, Williams sued the Defendants here, accusing each Officer of using excessive force (Counts I and II) and of failing to intervene in the other's excessive use of force (Counts III and IV). *See generally* Complaint [ECF No. 1]. After some protracted litigation, the Defendants moved for summary judgment, contending that they're entitled to qualified immunity. *See* Defendants' Motion for Summary Judgment (the "MSJ") [ECF No. 39].[1] As we explain in more detail below, we agree that both Defendants are entitled to qualified immunity and now **GRANT** their MSJ.

---

[1] The MSJ is fully briefed and ripe for adjudication. *See* Defendants' Statement of Facts (the "Defs.' SOF") [ECF No. 40]; Plaintiff's Response to the MSJ (the "Response") [ECF No. 52]; the Plaintiff's Response to the Defendants' Statement of Facts ("Pltf.'s SOF") [ECF No. 51]; the Defendants' Reply (the "Defs.' Reply") [ECF No. 61].

## THE FACTS[2]

At summary judgment, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (cleaned up). "In qualified immunity cases," in particular, "this usually means adopting . . . the plaintiff's version of the facts." *Ibid.* But we don't blindly credit everything the non-movant says: We view the facts in the light most favorable to the non-moving party "only if there is a genuine dispute as to those facts." *Id.* at 380 (citing FED. R. CIV. P. 56(c)). A dispute is *not* genuine when the opponent merely suggests "some metaphysical doubt as to the material facts." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Put plainly, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ibid.*

As in *Scott*,[3] we're faced with "an added wrinkle in this case: existence in the record of a videotape capturing [some of] the events in question." *Scott*, 550 U.S. at 378; *see also* Notice of

---

[2] "The facts are described in the light most favorable to the non-moving party." *Plott v. NCL Am., LLC*, 786 F. App'x 199, 201 (11th Cir. 2019); *see also Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[F]or summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the [non-movant]."). We accept these facts for summary-judgment purposes *only* and recognize that "[t]hey may not be the actual facts that could be established through live testimony at trial." *Snac Lite, LLC v. Nuts 'N More, LLC*, 2016 WL 6778268, at *1 n.1 (N.D. Ala. Nov. 16, 2016); *see also Cox Adm'r US Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion may not be the actual facts. They are, however, the facts for present purposes[.]" (cleaned up)). In considering the Defendants' MSJ, then, we describe the facts in the light most favorable to the Plaintiff—drawing mostly from the Plaintiff's Response SOF. We thus rely on the Defendants' SOF *only* where the Plaintiff has failed to genuinely dispute a proposition the Defendants have asserted there. *See* S.D. FLA. L.R. 56.1(b) ("All material facts set forth in the movant's statement filed and supported as required above will be deemed admitted unless controverted by the opposing party's statement provided that the Court finds that the movant's statement is supported by evidence in the record.").

[3] In *Scott*, the plaintiff sued Deputy Scott and others, alleging that they violated his constitutional rights by using excessive force when, during a car chase, Deputy Scott rammed the plaintiff's vehicle off the road. *Scott*, 550 U.S. at 376. The trial court denied Deputy Scott's motion for summary judgment and, on interlocutory appeal, the Eleventh Circuit affirmed. The Supreme Court, however, reversed—in

Conventional Filing of USB Drive Containing Body Worn Camera Footage (the "Body Cam Footage") [ECF No. 47]. As the Eleventh Circuit recently explained, "if a valid recording completely and clearly contradicts a party's testimony, that testimony is not credible, and the court should disregard it." *Brooks v. Miller*, 78 F.4th 1267, 1278 (11th Cir. 2023); *see also Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) ("[W]here an accurate video recording completely and clearly contradicts a party's testimony, that testimony becomes incredible."); *ibid.* ("At times, we too have discarded a party's account when the account is inherently incredible and could not support reasonable inferences sufficient to create an issue of fact."). In other words, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.[4]

Notably, this principle doesn't just come into play when the non-movant's story is undermined by incontrovertible evidence—like an unchallenged video. Summary judgment (the Supreme Court

---

part because the trial and appellate courts had both erred when they "adopted respondent's assertions that, during the chase, there was little, if any, actual threat to pedestrians or other motorists, as the roads were mostly empty and respondent remained in control of his vehicle." *Id.* at 378 (cleaned up). "The videotape," the Court wrote, "tells quite a different story. There we see respondent's vehicle racing down narrow, two-lane roads in the dead of night in speeds that are shockingly fast. We see it swerve around more than a dozen other cars, dross the double-yellow line, and force cars traveling in both directions to their respective shoulders to avoid being hit. . . . Far from being the cautious and controlled driver the lower court depicts, what we see on the video more closely resembles a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury." *Id.* at 379–80. Since the video—whose authenticity the plaintiff hadn't attacked—"so utterly discredited" the plaintiff's version of events, the Court concluded, "the Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape." *Id.* at 380–81.

[4] The Eleventh Circuit recently reaffirmed that "*Scott's* rule has its limits. Most obviously, it applies only when the video actually proves that the plaintiff's version of the facts cannot be true. When the action happens off camera and the audio doesn't clearly contradict the plaintiff's story, *Scott's* rule becomes irrelevant. Under those circumstances, we default to the usual rule: we accept the nonmoving party's version of the facts in determining whether to enter summary judgment." *Brooks*, 78 F.4th 1271–72.

has told us) may *also* be appropriate where "the [party's] story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985); *see also Schultz v. Am. Airlines, Inc.*, 449 F. Supp. 3d 1301, 1311 (S.D. Fla. 2020) (Altman, J.), *aff'd.* 855 F. App'x 656 (11th Cir. 2021) ("[W]hile a plaintiff's testimony may not ordinarily be discounted at summary judgment, the Court may disregard self-serving testimony that is 'blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed.'" (cleaned up and citing *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013))). In short, where other record evidence "so squarely contradicts a plaintiff's story as to render it implausible on its face, summary judgment is appropriate." *Schultz*, 449 F. Supp. 3d at 1311. With these guiding principles in mind, we turn to our facts.

The Defendants—Gregory Mallet and Jorge Prince, Jr.—are both Miami-Dade Police Department Officers who, on August 5, 2017, were assigned to the Crime Suppression Unit in the Cutler Ridge area. *See* Defs.' SOF ¶ 1; Pltf.'s SOF ¶ 1 ("Undisputed."). The Crime Suppression Unit's mission includes "saturation detail," which involves "showing presence in a certain area. . . . It's a number of officers in an area[.]" Jorge Prince, Jr. Deposition ("Prince Dep.") [ECF No. 51-1] at 8:20–25. In other words, Crime Suppression details aim to "*proactively* investigat[e] potential criminal conduct in high crime areas." Defs.' SOF ¶¶ 2, 7 (emphasis added); Pltf.'s SOF ¶¶ 2, 7 (both "[u]ndisputed."); Prince Dep. at 53:17–20 ("Q: Okay. Does that mean you're like proactively looking for crimes being committed? [Objection omitted]. A: Yes, it is."). On the night they encountered our Plaintiff, the Officers were performing a saturation detail in Cutler Ridge, which is "an area where there's a lot of shootings, a lot of homicides, a lot of burglaries, a lot of robberies, a lot of narcotics. . . . [T]hey were giving these details because the crime spiked up. So basically they wanted, you know, officers out there to try to deter the crime, to lower . . . make it safer for the community." Gregory Mallet Deposition

("Mallet Dep.") [ECF No. 51-2] at 14:18–15:2; *see also generally* Pltf.'s SOF (not disputing Officer

Mallet's explanation of the Crime Suppression Detail's work). The Officers were riding together in a

marked patrol car—Officer Mallet driving, Officer Prince in the passenger seat, and *both* wearing their

Miami-Dade Police Department uniforms. *See* Defs.' SOF ¶¶ 3, 4; Pltf.'s SOF ¶¶ 3, 4 (both

"[u]ndisputed."). Just before 1 a.m., the Officers spotted Williams perched partially inside the

passenger-side of a car, with "one door open and one leg out."[5] Palmer Williams Deposition

("Williams Dep.") [ECF No. 51-3] at 93:22–23; *see also* Prince Dep. at 51:11–15 ("A: During the time,

he was in the passenger's side of the vehicle . . . . The vehicle was located on the side of the road in

front of an open field, which a vehicle had no business to be there."); Mallet Dep. at 16:23–17:1 ("A:

So we saw the vehicle parked on the side of the road. I saw the passenger door wide open. I see the

silhouette of someone inside of the vehicle through the passenger side."); Williams Dep. at 103:7–18

("Q: [W]here does Ms. Coney park the car? A: She parked on the right-hand side. . . . The field on the

right and she parked on the right. Q: Right. So it's next to the open field, right? A: Right. Next to the

open field. And this house is across the street."); Defs.' SOF ¶ 5 ("At approximately 12:44 a.m., the

---

[5] The Defendants also say that Williams was "using some type of flashlight device, possibly a phone, to rummage through the vehicle," Defs.' SOF ¶ 5—an assertion Williams disputes, *see* Pltfs.' SOF ¶ 5; *compare* Prince Dep. at 51:11–13 ("A: During the time, he was in the passenger's side of the vehicle with a flashlight in his hand."), *and* Mallet Dep. at 16:21–17:6 ("Q: Okay. What was it that you saw that you believe gave you reasonable suspicion to make a stop? A: So we saw the vehicle parked on the side of the road. I saw the passenger door wide open. I see the silhouette of someone inside of the vehicle through the passenger side. And I saw what – you know, some type of flashlight device. I – honestly, I thought this was a burglary in progress. So I immediately drove behind the vehicle, exited the driver's side and approached the vehicle through the driver's side."), *and* Mallet Dep. at 19:24–20:08 ("Q: And did he have a flashlight in his hand? A: I don't think – I don't think it was a flashlight. I think honestly it was – it had to be his phone. I can't recall. I know it was something illuminating inside of the vehicle. Q: Did you recover a phone? A: I can't recall. Q: Did you recover a flashlight? A: No."), *with* Williams Dep. at 110:1–7 ("Q: Okay. But you didn't turn on any lights inside the car? A: No, ma'am. It didn't look like something in the car. For what reason? Q: Okay. No, no, no, maybe you're eating and you want more light. I don't know. A: No. No. No. No. No. No."). There is, therefore, a genuine dispute as to whether Williams was using a light to see inside the car—though, as we'll soon see, none of this will matter to our analysis.

Officers observed Plaintiff Palmer Williams III partially inside the passenger side of a parked vehicle next to an open field, passenger door wide open[.]"); Pltf.'s SOF ¶ 5 (failing to genuinely dispute the time of his first encounter with the Officers, the place where the Officers first saw him, or the fact that he was partly inside the passenger side of the car).[6]

"Because it was the middle of the night, it was dark outside." Defs.' SOF ¶ 8; Pltf.'s SOF ¶ 8 (failing to genuinely dispute that it was dark outside but adding that the area was "well lit by a streetlight");[7] *see also* Mallet Dep. at 45:2–3 ("A: Basically – honestly, I didn't – it was dark."); Williams Dep. at 93:13–22 ("A: . . . So we were riding around and then we decided to go get the barbecue because, you know, that what we do on a Friday. And we went, got the barbecue. It was getting dark. I'd say, I guess it was dark by that time.").[8]

---

[6] The Defendants include three main facts in paragraph 5. "[A]t approximately 12:44 a.m.," they say, "the Officers observed Plaintiff Palmer Williams III partially inside the passenger side of a parked vehicle next to an open field, passenger door wide open, and using some type of flashlight device, possibly a phone, to rummage through the vehicle." Defs.' SOF ¶ 5. Williams "[d]ispute[s]" this entire assertion. Pltf.'s SOF ¶ 5. But, in his disputation, he only *really* objects to the Defendants' characterization of what he was *doing* in the car: "Defendants," he says, "saw a black man seated in a car, late at night, in a high crime area. Palmer Williams was simply seated in his car eating and the bag of food can be seen on the floorboard of the vehicle in Mallet's bodycam. No flashlight or cell phone were found or recovered or seen anywhere on the body cams." *Ibid.* Since he doesn't dispute the time or place of the encounter—or the fact that he was sitting "partially inside the passenger side of a parked vehicle next to an open field" with the "passenger door wide open"—we'll deem those facts admitted. *See* S.D. FLA. L.R. 56.1(b) ("All material facts set forth in the movant's statement filed and supported as required above will be deemed admitted unless controverted by the opposing party's statement provided that the Court finds that the movant's statement is supported by evidence in the record.").

[7] Williams admits that the arrest occurred "late at night." Pltf.'s SOF ¶ 5. Still, he "[d]ispute[s]" the Officers' assertion that "it was dark outside," Defs.'s SOF ¶ 5, because (he says) the area was "well lit by a streetlight," Pltf.'s ¶ 6. Since both things can be true, we'll assume that it was dark out by the open field in the middle of the night—even as we'll acknowledge that the area where the car was parked was lit by a streetlight. Needless to say, no part of our analysis will turn on this dispute.

[8] Admittedly, the parties haven't cited this portion of Williams's testimony. Still, while we "*need* consider only the cited materials," we "*may* consider other materials in the record." FED. R. CIV. P. 56(c)(3) (emphases added); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment.").

The Officers, believing that Williams "was committing a vehicle burglary," pulled over to investigate. Prince Dep. at 51:5–9 ("Q: Okay. So you had no reason to stop him then? A: No, sir, Mr. Williams was stopped because we did believe that he was committing a vehicle burglary."); Mallet Dep. at 17:2–6 ("I – honestly, I thought this was a burglary in progress. So I immediately drove behind the vehicle, exited the driver's side and approached the vehicle through the driver's side."); *id.* at 20:23–21:2 ("Sir, it has nothing to do with black or – you know, what the race. It's – you know, it's – it could have been in Coral Gables, you know. I believed, you know, that it was a burglary in progress."); *see also* Defs.' SOF ¶ 9; Pltf.'s SOF ¶ 9 (failing to genuinely dispute this point).[9] The Officers approached Williams's car—with Officer Mallet on the driver's side and Officer Prince on the passenger's side.

---

[9] For two reasons, Williams again fails to create a genuine dispute here. *First*, he writes: "Disputed. See Plaintiff's dispute of Fact No. 2 above." Plts.'s SOF ¶ 9. But Fact 2 is "undisputed," and it's not our job to scour the record for the point the Plaintiff *meant* to make. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); *see also Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) (noting that the district court has no independent obligation to "mine the record"). *Second*, if we were guessing, we'd assume that Williams meant to refer to his assertion in Fact 5, where he says: "Disputed. Defendants saw a black man seated in a car, late at night, in a high crime area. Palmer Williams was simply seated in his car eating and the bag of food can be seen on the floorboard of the vehicle in Mallet's bodycam. No flashlight or cell phone were found or recovered or seen anywhere on the body cams." Pltf.'s SOF ¶ 5. But that's all irrelevant to the assertion the Defendants are making in paragraph 9. Whether Williams was eating in the car—and whether he had a flashlight or a phone—just has nothing to do with the Officers' *belief* that they had interrupted a burglary in progress. *See* S.D. FLA. L.R. 56.1(b) ("All material facts set forth in the movant's statement filed and supported as required above will be deemed admitted unless controverted by the opposing party's statement provided that the Court finds that the movant's statement is supported by evidence in the record.").

Defs.' SOF ¶ 10; Pltf.'s SOF ¶ 10 ("Undisputed.").[10] As they approached, the Officers told Williams to "get out" of the car, and he complied. *See* Defs.' SOF ¶ 14 ("The Officers told Plaintiff to 'get out' of the car to arrest him."); Pltf.'s SOF ¶ 14 ("Undisputed."); *see also* Williams Dep. at 114:17–21 ("Q: And as soon as the officers approached your car, what do they say to you? A: 'Get out.' Q: And what do you do? A: I get out."). Officer Prince then told Williams to "get on the ground[,] [a]nd then he slammed [Williams] on the ground" and "tripped []him]." Williams Dep. at 123:3–11 ("Q: So the officers tell you to step out of your car? A: Yes. Q: And then what happens? A: The – the big officer[11] started getting – harassing – you know, riding with me and then he said 'Get on the ground, get on the ground, get on the ground.' And then he slammed me on the ground, tripped me."). After Officer Prince "redirected Plaintiff to the ground," he fell to the ground himself. Defs.' SOF ¶ 17; Pltf.'s SOF ¶ 17 (not disputing that Williams "was almost immediately taken to the ground by Defendant Prince," but adding that the take-down came without "an opportunity to comply"); Defs.' SOF ¶ 18 ("Both Officer Prince and Plaintiff fell to the ground."); Pltf.'s SOF ¶ 18 ("Undisputed."). Once they were on the ground, Officer Prince ordered Williams to put his hands behind his back. *See* Williams Dep. at 135:17–25 ("Q: Did they say, 'Oh, Mr.' – well, did they say, 'Put your' – I know they didn't know your name at the time. So did they say, 'Put your hands behind your back?' A: Yes, when I was on the

---

[10] The parties disagree about what happened next: Officer Mallet says that he saw Williams trying to hide a plastic baggie (of suspected drugs) under the driver's seat. *See* Defs.' SOF ¶ 12; Mallet Dep. at 17:10–12 ("Yes, sir. That's when, you know, he gets startled. I see the narcotics in his hands. He dumps it under."); Mallet Dep. at 19:9–13 ("Q: Okay. And what did you see Mr. Williams doing? A: When he saw me, he panicked. And then that's when he – I see him with the drugs, and then he puts it under the driver's seat."). Williams denies that he did any such thing. *See* Pltf.'s SOF ¶ 12 ("Disputed. Palmer Williams was sitting in the car eating when he was approached by Defendants."); Williams Dep. at 117:8–14 ("Q: But did – so it's your position that you were not holding a baggy of cocaine in your hand when the officers approached you? [Objection omitted]. A: No."); Williams Dep. at 117:20–21 ("Q: You were not holding cocaine? A: No."). Of course, we'll credit the Plaintiff's account at summary judgment.
[11] "The big officer" is Officer Prince. *See* Defs.' SOF at 4 n.1. ("Throughout his deposition, Plaintiff refers to Officer Prince Jr. as the 'big' or 'bigger' officer and Officer Mallet as the 'small' or 'smaller' officer.").

ground. Q: When you were on the ground, they said, 'Put your hands behind your back.' So that's when? When you needed – when you guys fell to the ground? A: Yes."). But Williams—for reasons that, as we'll see, are hotly disputed—writhed around on the ground, moving his head and body. *See id.* at 124:19–125:5 ("Q: And so when the officers try to arrest you, what do you do? A: I'm moving on the ground because the other little one kicking me in my eye, making me move on the ground, and I'm telling him I can't see. I cannot – I can't just lay there, somebody hitting me in my eye, punching me in my eye. Q: Right. So what are you doing? What are you doing? A: I'm moving on the ground like this here? Q: You're moving your body? A: Yes, ma'am."); Defs.' SOF ¶ 21 ("The Officers told Plaintiff to stop moving, but Plaintiff kept moving his body on the ground."); Pltf.'s SOF ¶ 21 (conceding that the "Plaintiff, who was face-down on the ground the entire physical encounter, moved and writhed his body as any normal person would who is being beaten in the face to the point of being blind while being restrained by a person on top of them"). The Officers, Williams's girlfriend (Sanders Coney), and another witness *all* implored Williams to stop resisting. *See* Body Cam Footage at 0:43 ("[Officer]: Stop resisting."); *id.* at 0:51 ("[Officer]: Stop resisting."); *id.* at 1:05 ("[Officer]: Stop resisting."); *id.* at 1:07 ("[Coney]: Palmer, stop resisting."); Sanders Jean Coney Deposition ("Coney Dep.") [ECF No. 40-5] at 77:7–12 ("Q: Ms. Coney, is that your voice in the background saying, 'Palmer, stop resisting?' A: Yeah, because they was kicking him, I was telling him don't resist, but he – the more he say, 'they kicking me.' Do you hear when he say, 'they s[t]ay kicking me?'"); Body Cam Footage at 1:30 ("[Officer]: Stop resisting."); *id.* at 1:31 ("[Woman[12]]: Stop resisting."); *id.* at 1:42

---

[12] According to Ms. Coney, the second woman we hear yelling "stop resisting" wasn't her. She thinks it may have been another acquaintance, Darlene Fudge (who wasn't deposed in this case). *See* Coney Dep. at 78:17–79:2 ("Q: Is minute 1:30 to 1:45 also you saying, stop resisting? A: No, sound like it was someone else. I think it might have been the other girl. When they was kicking him we were saying, 'don't resist.' Q: Do you think it could have been, at minute 1:30, do you think it might have been Darlene Fudge? A: Pardon me? Q: Do you think it might have been Darlene Fudge? A: It might have been her.").

("[Officer]: Stop resisting."); *id.* at 1:43 ("[Woman]: Stop resisting, Palmer."); *id.* at 1:54 ("[Officer]: Stop fucking resisting."); *id.* at 2:43 ("[Officer]: Bro, you're gonna get more charges. Stop resisting."); *id.* at 2:51 ("[Officer]: Bro, chill, man. Stop."); *id.* at 3:05 ("[Officer]: Bro, please, stop. Man, come on, bro.").

As Williams thrashed around, "Officer Prince put his knee on the back of [the] Plaintiff's neck to hold him down," and Officer Mallet "gave [the] Plaintiff five or six distractionary punches and kneed him three times in the face." Defs.' SOF ¶¶ 22–23; Pltf.'s SOF ¶¶ 22–23 (both "[u]ndisputed."). For more than three minutes, the Officers struggled to handcuff Williams.[13] *See* Body Cam Footage at 0:43–1:05 ("[Officer]: Stop resisting. Stop resisting. Stop resisting."); *id.* at 2:19–2:43 ("[Officer]: He's stopping it from fucking – bro . . . Bro, you're gonna get more charges. Stop resisting."); *id.* at 2:45–2:52 ("[Officer] Give us your hand. Give us your hand, bro. Bro, chill man, stop."). Here (again), Williams fails to create a genuine dispute of material fact. "[T]he video," he insists, "does not show any of Palmer Williams' hands being out of a handcuff at any time and it does show his arms are both behind his back at all times in the video." Pltf.'s SOF ¶ 31. But we've watched the video many times, and that's simply not true. *First*, the body cam shows that, more than a minute into the tussle on the ground, one of Williams's hands was *still* free. *See* Body Cam Footage at 1:03. The video thus "utterly discredit[s]," *Scott*, 550 U.S. at 380, Williams's claim that it was "just a split second" from when he fell to the ground to when his second hand was cuffed, *see* Williams Dep. at 131:15–18. *Second*, at least twice during the video, we can hear one of the officers ordering Williams to give up his "hand [singular]." Body Cam Footage at 2:45 ("[Officer]: Give us your hand."); *id.* at 2:49 ("[Officer]: Give

---

[13] Neither officer had his body cam turned on when the altercation began, so we're not really sure how much time passed between the Officers' initial approach and Williams's arrest. As we've said, when the footage turns on, Williams and both Officers are already on the ground—and they stay there for about three minutes until Officer Prince manages to get the second cuff on—at which point the struggle ends, and Officer Mallet stands up and walks away.

us your hand, bro."). *Third*, while we can't see Officer Prince fasten the second handcuff on the video, we can clearly *hear* him fasten two handcuffs at two separate times—once very early in the video (*see id.* at 0:48, where we hear a metallic sound, like a handcuff closing, and Officer Prince declares "I got it"), and a second time towards the end of the video (*see id.* at 3:11, where we hear another metallic sound, like a handcuff fastening); *id.* at 3:13 (finally showing both of Williams's hands cuffed and Officer Mallet walking away).

*Immediately* after we hear the second cuff come on, the struggle ends, and Officer Mallet gets up and walks away. *See id.* at 3:13. As we've explained, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380; *id.* at 380–81 ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape."). Because the video *clearly* shows that one of Williams's hands was uncuffed (*see* Body Cam Footage at 1:05), we reject his contention that "the video does not show any of Palmer Williams' hands being out of a handcuff at any time and it does show his arms are both behind his back at all times in the video." Pltf.'s SOF ¶ 31.

Fire rescue finally arrived and transported Williams to a hospital, where doctors performed surgery on his eye. *See* Williams Dep. at 121:10–11 ("A: I went to the hospital after that, when I had three hospitals I had to go to for surgery."); Defs.' SOF ¶ 32 ("Fire rescue responded to the scene and attended to Plaintiff."); Pltf.'s SOF ¶ 32 ("Undisputed."); *see also* Williams Dep. at 150:23–151:1 ("A: I went to Jackson South, Jackson North, and they says 'He got to have immediate surgery.' So they transferred me from North to Bascom Palmer."); Williams Dep. at 151:23–152:17 ("A: [The doctor at Bascom Palmer] asked me this, 'Do you want take you – do you want me to close your globe, or do

you want me to take – take your eyeball out?' . . . Q: Okay. And so what did you decide to do? A: Close it. . . . The globe, the globe of your eye. . . . The one behind – yes, behind my eyeball, because they took my eyeball out and did surgery on it and put it back in.").

## THE LAW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In determining whether to grant summary judgment, the Court must consider "particular parts of materials in the records, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c). "By its very terms, [the summary judgment] standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Ibid.* "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving

12

party to "come forward with specific facts showing there is a genuine issue for the trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (cleaned up); *see also* FED. R. CIV. P. 56(e).

When ruling on a motion for summary judgment, the Court "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."); *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the record" (quoting FED. R. CIV. P. 56 advisory committee's note to 2010 amendment)). In any event, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001). "[A]ssessments of credibility—no less than the weighing of evidence—are fact questions not susceptible of disposition at summary judgment." *Obremski v. Armor Corr. Health Servs., Inc.*, 467 F. Supp. 3d 1265, 1275 (S.D. Fla. Apr. 7, 2020) (Altman, J.) (citing *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012)).

"[I]f there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial." *Torres v. Wal-Mart Stores E., LP*, 555 F. Supp. 3d 1276, 1282 (S.D. Fla. Aug. 17, 2021) (Altman, J.). The Court, on the other hand, must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of [its] case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Child. & Fams.*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (cleaned up)).

## ANALYSIS

In his Complaint, Williams advances four counts: excessive force against Officer Mallet (Count I); excessive force against Officer Prince (Count II); failure to intervene against Officer Mallet (Count

13

III); and failure to intervene against Officer Prince (Count IV). *See* Compl. ¶¶ 36–69. The Officers, seeking qualified immunity, have moved for summary judgment on all counts. *See generally* MSJ. We agree with the Officers and now grant their MSJ.

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). By imposing liability *only* for violations of clearly established law, the defense of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

To qualify for the immunity, the officer "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)). Once "the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Ibid.* "To overcome a qualified immunity defense, the plaintiff must make two showings." *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019). *First*, "the plaintiff must establish that the defendant violated a constitutional right." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007). *Second*, "the plaintiff must show that the violation was clearly established." *Ibid.* Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Corbitt*, 929 F.3d at 1311 (quoting *Pearson*, 555 U.S. at 236).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he

confronted." *Vinyard*, 311 F.3d at 1350 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "Put another way, the defendant must have fair notice of his conduct's unconstitutionality, which derives from one of the following sources: (1) the obvious clarity of constitutional or statutory language; (2) broad holdings or statements of principle in case law that are not tied to particularized facts; or (3) fact-specific judicial precedents that are not fairly distinguishable." *Eloy v. Guillot*, 289 F. App'x 339, 346 (11th Cir. 2008) (citing *Vinyard*, 311 F.3d at 1350–52). "The critical inquiry is whether the law provided [the officer] with 'fair warning' that his conduct violated the [the plaintiff's rights]." *McClish v. Nugent*, 483 F.3d 1231, 1248 (11th Cir. 2007) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). In this Circuit, only the "decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here, the Supreme Court of Florida) can clearly establish the law." *Id.* at 1237.

"[I]n the end, we must still slosh our way through the factbound morass of 'reasonableness.'" *Scott*, 550 U.S. at 383. "[A]t the summary judgment stage," however, "once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*, the reasonableness of the officer's actions . . . is a pure question of law." *Penley v. Eslinger*, 605 F.3d 843, 848–49 (11th Cir. 2010) (cleaned up and citing *Scott*, 550 U.S. at 381 n.8).

### A.  Discretionary Authority

The Officers in our case were acting within their discretionary authority because stops and arrests are "powers that legitimately form a part of their job." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1267 (11th Cir. 2004); *see also Burnett v. Unified Gov't of Athens-Clarke Cnty.*, 395 F. App'x 567, 568 (11th Cir. 2010) ("The official responsibilities of a police officer on patrol include making traffic stops and arresting people who are suspected of committing traffic violations."). And, to his credit, Williams agrees that, "at all times material hereto, the acts and omissions of Defendants were committed within the scope of their employment as Miami-Dade Police Department Officers."

Compl. ¶ 8. To circumvent qualified immunity, then, Williams must show that the Officers violated his "clearly established" constitutional right to be free from the use of excessive force. *See Saucier*, 533 U.S. at 201.

### B. Excessive Force

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee*, 284 F.3d at 1197. To determine whether the force police officers used was excessive, a court must determine "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (cleaned up). This inquiry "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Lee*, 284 F.3d at 1197 (quoting *Graham*, 490 U.S. at 396 (cleaned up)). In assessing the "reasonableness" of the force the officers deployed, we look to "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Generally, "we do not second guess these decisions where the amount of force applied was not grossly disproportional to [the arrestee's] resistance[.]" *Flowers v. City of Melbourne*, 557 F. App'x 893, 895 (11th Cir. 2014). And, "[i]n deciding whether the force deliberately used is, constitutionally speaking, 'excessive,'" we use an objective measure of reasonableness—that is, we "must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015); *see also Powell v. Snook*, 25 F.4th 912, 921 (11th Cir. 2022) ("We view the facts from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and we balance the risk of bodily harm to the suspect against the gravity of the threat the officer

sought to eliminate." (cleaned up and citing *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009))), *cert. denied*, 143 S. Ct. 110 (2022).[14]

In deciding whether the Officers deployed excessive force against Williams, we'll have to separate the force they used *before* he was handcuffed from the force they employed *after* he was subdued because, generally speaking, "[w]hen jailers continue to use substantial force against a prisoner who has clearly *stopped resisting*—whether because he has decided to become compliant, he has been subdued, or he is otherwise incapacitated—that use of force is excessive." *Piazza v. Jefferson Cnty., Ala.*, 923 F.3d 947, 953 (11th Cir. 2019) (emphasis in original). Since Williams focuses his entire analysis on the force (he claims) the Officers used *after* he was handcuffed, we'll start there.

### 1. The Force the Officers Used After Williams Was Handcuffed

In his summary-judgment Response, Williams argues (for the time) that, "[w]hen the facts are taken from Plaintiff's perspective, Plaintiff did not resist, *he was handcuffed, and then* he was attacked." Response at 10 (emphasis added); *see also* Pltf.'s SOF ¶ 51 ("Defendant Prince and Mallet handcuffed him *and then* beat him until he was blind." (emphasis added)). But, as the Officers point out, "this allegation was never made in the Complaint. To the contrary, the Complaint states that all force stopped after Plaintiff was handcuffed, which is an admission that Plaintiff cannot deny under Eleventh Circuit precedent." Reply at 1.

Williams's Complaint unambiguously alleges *only* that the Officers deployed force against him *before* he was handcuffed. Here's the relevant part of his pleading:

> Defendants ripped Plaintiff out of his vehicle. . . . tripped Plaintiff causing him to fall
> face down. . . . proceeded to punch Plaintiff repeatedly in the face with spiked gloves

---

[14] Williams repeatedly insists that we assess the quantum of force the Officers used from *his* perspective. *See* Response at 7 ("From Plaintiff's perspective, Defendants were simply looking to make an arrest . . . . from Williams' perspective, there is no force needed . . . . From Plaintiff's perspective he never posed a threat[.]"). But the law is clear that "[t]he *only* perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009) (emphasis added).

> and kicked him in the face. . . . beat him in the face so severely his eye was ruptured
> and he is now permanently blind. Defendants finally stopped punching Plaintiff after
> handcuffing him. After the arrest, Defendants turned on their body worn cameras. . .
> . Plaintiff was transported to Jackson South Hospital for medical treatment of his
> injuries.

Compl. ¶¶ 20–27. As this quotation makes plain, Williams was very careful in his Complaint to walk

us through the sequence of events as he remembered them: (1) the Officers "ripped" him "out of his

vehicle," (2) the Officers "tripped" him, "causing him to fall face down," (3) the Officers "proceeded

to punch" him "repeatedly in the face with spiked gloves and kicked [him] in the face," (4) the Officers

"finally stopped punching" him "after handcuffing him," (5) "after the arrest," the Officers activated

their body-worn cameras, and (6) Williams was taken to the hospital. There's no ambiguity or wiggle

room here: Williams gave us the events in sequential order—from when the Officers pulled him out

of the car to when they took him to the hospital. And, in that sequence, the "tripping," "punching,"

and "kicking" clearly come *before* the "handcuffing"—which, of course, is when Williams says the

Officers "*stopped* punching" him. Williams thus cannot argue, in response to the Officers' summary-

judgment motion, that the punching and kicking took place *after* he was handcuffed.

A "plaintiff may not amend her complaint through argument in a brief opposing summary

judgment." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (citing *Shanahan v.

City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996)). Because a plaintiff has an obligation to give the

defendant fair notice of the claims against him, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007),

"when making the necessary preliminary determination of what claims the plaintiff has actually raised

(and therefore, what claims he must have standing to raise), we are bound by the contents of the

plaintiff's pleadings, even on summary judgment," *Watlters v. Fast AC, LLC*, 60 F.4th 642, 652 (11th

Cir. 2023) (cleaned up). "Put another way, facts and theories not raised in the pleadings are not

properly considered on motions for summary judgment." *Moulton v. Prosper*, 2019 WL 4345674, at *10

(S.D. Fla. Sept. 12, 2019) (Altman, J.) (citing *Ivax LLC v. Celgene Corp.*, 2013 WL 12085972, at *2 (S.D. Fla. Mar. 7, 2013) (Dimitrouleas, J.)).

Courts in our Circuit thus routinely exclude evidence—and refuse to consider arguments—that weren't included in a party's pleadings. *See, e.g.*, *Wu v. Thomas*, 996 F.2d 271, 275 (11th Cir. 1993) ("Plaintiffs did not introduce the 1981 speech as a basis for retaliation until they clarified their claims for a pretrial order. In that order, the district court took note of the new allegations about the 1981 speech, but added that the complaint would control the scope of plaintiffs' claims. Testimony on the 1981 speech was irrelevant to anything pled in the complaint and was therefore properly excluded."); *Leathers v. State Farm Mut. Auto. Ins. Co.*, 2013 WL 12121324, at *5 (N.D. Ga. Aug. 28, 2013) ("As this new factual allegation is raised for the first time in response to Defendants' motion for summary judgment, it will not be considered."). The law is well-settled, in short, that "a plaintiff must seek leave to amend his complaint *before* the court can consider his new factual allegations at summary judgment." *Moulton*, 2019 WL 4345674 at *10.

Unfortunately, Williams didn't amend his Complaint within the deadline we set for amended pleadings. *See* Scheduling Order [ECF No. 22] at 1 (setting forth amendment deadline of November 15, 2021). Nor did he *ever* seek leave to amend his Complaint *after* that deadline had passed. Indeed, Williams failed to seek leave to amend his Complaint *even after* the Officers argued, in their Reply, that "the Court must accept that [the] Plaintiff was not handcuffed at the time force was used against him" because the "Plaintiff's admission [in his Complaint] that the Officers' use of force occurred *before* he was handcuffed precludes him from now claiming the very opposite." Reply at 2–3. Since Williams contends, in his Response, *only* that the Officers deployed unconstitutional force *after* he was handcuffed—and because his Complaint includes no such allegation—we **GRANT** the Defendants' MSJ as to any allegation that the Officers deployed excessive force *after* Williams was handcuffed.

We add here only that Williams's claim—that the Officers beat him *after* he was handcuffed—would fail *even if* he had asserted it in his Complaint. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. And the story Williams told at his deposition—the one he now parrots in his summary-judgment Response—is "so utterly discredited" by the Body Cam Footage that, to quote the Supreme Court, we won't "rel[y] on such visible fiction[.]" *Id.* at 380–81. Here's how Williams described the tussle at his deposition:

> Q: You fall to the ground and the officer – the big officer is able to put the handcuff on your arm?
> A: Yes.
> Q: What arm?
> A: Left.
> Q: He puts it – one handcuff on the left?
> A: Yes.
> Q: But he's struggling to put it on the right?
> A: No, he not struggling because here come the other little officer – the other officer, who put it back there to get – handcuff me.
> Q: So your contention is that when you fall to the ground, what you do is basically just put your hands behind your back and –
> A: No. I didn't say I put my hands behind my back. I said when I fall to the ground, the officer put my hand behind my back. Both hands. Him and the other officer.[15]
> Q: And immediately put the *handcuffs* [plural] on you?
> A: *Yes. And then* start beating me.

---

[15] We're not weighing credibility here, but we're not sure what to believe when Williams denies "put[ting] your hands behind your back[.]" After all, just a few pages later (in *the same deposition*), he says just the opposite:

> Q: When you were on the ground, they said 'Put your hands behind your back.' So that's when? When you needed – when you guys fell to the ground?
> A: Yes.
> Q: Okay. And what did you do when they said that?
> A: *I put my hands behind my back* and then the other one came. And the other one put the handcuffs on. The big one put the handcuffs on down and then the other little one came up and put that – gave him the other handcuff.

Williams Dep. at 135:22–136:6 (emphasis added). None of this matters to our analysis.

Williams Dep. at 126:23–127:18 (emphases added). In case there were any doubt that Williams is now claiming the Officers handcuffed *both* hands right away, he doubled down on this fiction later in his deposition:

> Q: And then how quickly after [putting on the first handcuff] was he able to put the other handcuff on?
> A: Just a split second.

*Id.* at 131:9–13. Williams then reiterates this central theme in his SOF. "[T]he video," he insists there, "does not show any of Palmer Williams' hands being out of a handcuff at any time and it does show his arms are both behind his back at all times in the video." Pltf.'s SOF ¶ 31.

As we've explained, however, Williams's claims are (in at least three ways) *completely* contradicted by the video. *First*, the video shows that, more than a minute into the struggle, one of Williams's hands was *still* free. *See* Body Cam Footage at 1:03. The video thus "utterly discredit[s]," *Scott*, 550 U.S. at 380–81, Williams's claim that it was "just a split second" from when he fell to the ground to when his second hand was cuffed, *see* Williams Dep. at 131:15–18. *Second*, at least twice during the video, we can hear one of the Officers ordering Williams to give up his "hand [singular]." *See* Body Cam Footage at 2:45 ("[Officer]: Give us your hand."); *id.* at 2:49 ("[Officer]: Give us your hand, bro."). The Officers *obviously* wouldn't be asking for Williams's hand (almost three minutes into the video) if they had already cuffed *both* hands when the video feed started. *Third*, while we can't see Officer Prince fasten the second handcuff on the video, we can clearly *hear* him fasten two handcuffs at *two separate times*—once very early in the video (*see id.* at 0:48, where we hear a metallic sound, like a handcuff closing, and Officer Prince declares "I got it"), and a second time towards the end of the video (*see id.* at 3:11, where we hear another metallic sound, like a handcuff fastening). As soon as we hear the second cuff close, the camera (for the first time) shows Williams with *both* hands cuffed. *See id.* at 3:13.

One more crucial fact: *Immediately* after we hear the second cuff come on, the struggle ends, and the video shows Officer Mallet standing up and walking away. *See id.* at 3:13. In other words, there isn't even a hint of any struggle or violence after the second cuff is fastened, and Williams (notably) never suggests that there is. Williams's claim that he was only beaten *after* his hands were both cuffed is thus "blatantly contradicted by the record." *Scott*, 550 U.S. at 380. And, as the Supreme Court has explained, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Ibid.*; *id.* at 380–81 (admonishing us, when a video utterly discredits the plaintiff's story, "not [to] rel[y] on such visible fiction" and requiring us, in such cases, to "view the facts in the light depicted by the videotape"); *see also Schultz*, 449 F. Supp. 3d at 1311 ("[W]hile a plaintiff's testimony may not ordinarily be discounted at summary judgment, the Court may disregard self-serving testimony that is 'blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed.'" (quoting *Feliciano*, 707 F.3d at 1253)).

*** 

Williams only ever defends himself against the Officers' MSJ by insisting that the Officers deployed excessive force against him *after* he was handcuffed. *See, e.g.*, Response at 7 ("According to Williams, they had him under arrest almost immediately, *and then* they attacked him." (emphasis added)); *id.* at 8–9 ("Instead, with guns drawn, rapidly engaged him, did not issue commands, accused him of burglary, and took him to the ground and cuffed him. *Then the beating began.*" (emphasis added)); *id.* at 10 ("When the facts are taken from Plaintiff's perspective, Plaintiff did not resist, he was handcuffed, *and then he was attacked.*" (emphasis added)). As we've seen, this central contention fails for two independent reasons. *One*, Williams failed to make any such allegation in his Complaint—and our Circuit's precedents are clear that a plaintiff cannot survive summary judgment by advancing, in his

22

summary-judgment response, an argument or theory he never asserted in his complaint. *Two*, Williams's claim that the Officers handcuffed *both* his hands immediately—and that they beat him only thereafter—is blatantly contradicted by the video footage. And summary judgment is appropriate, the Supreme Court has said, where "the [party's] story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Anderson*, 470 U.S. at 575. We therefore **GRANT** the Defendants' MSJ as to Williams's claim that the Officers used unconstitutional force *after* he was handcuffed.

### 2. The Force the Officers Used Before Williams Was Handcuffed

We're left, then, with an uncomfortable situation. The record seems clear that the Officers used a great deal of force to restrain Williams *before* he was handcuffed. And we'll dive into the parties' respective positions on the propriety of that force in a moment. But there's an overarching—and unfortunately dispositive—point we must highlight first: Williams (and especially his lawyer) seem to know and understand the law quite well. They understand, in particular, a principle we noted at the beginning of our analysis—which is that the law distinguishes between the force an officer deploys *before* a detainee is handcuffed and the force he employs *after*. Under this commonsense doctrinal divide, an officer will find it much more difficult (almost impossible really) to shroud himself in the protections of qualified immunity when he deploys force *after* a detainee is handcuffed because, generally speaking, "[w]hen jailers continue to use substantial force against a prisoner who has clearly *stopped resisting*—whether because he has decided to become compliant, he has been subdued, or he is otherwise incapacitated—that use of force is excessive." *Piazza*, 923 F.3d at 953 (emphasis in original).

With this doctrinal understanding in mind, Williams (and his lawyer) have pushed a story upon this Court that, had it been successful, would have almost guaranteed Williams the trial he thinks he deserves. Which is to say that, had we agreed with Williams that the Officers punched and kicked him *after* he was fully handcuffed, we would (very likely) have denied summary judgment *without* a vigorous

debate about the extent to which Williams was resisting. And, as we'll see, Williams and his lawyer probably felt that the record, such as it was, didn't favor a pitched battle on the field of resistance because the video plainly shows Williams's *own girlfriend* (and her friend) pleading with him to "stop resisting." So, Williams swung for the fences: Hoping to avoid a fight over the extent to which he was resisting, he went all-in on a new theory—that the Officers had beat him *only after* he was handcuffed. As we've seen, that story is just false—and no amount of lawyering can change that. The point here, though, is that, in pushing this new tale, Williams has forfeited any argument he might have had for the (more viable) position that the Officers deployed excessive force against him *before* he was handcuffed. *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court sua sponte [only] in extraordinary circumstances."); *Sappupo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed waived.").

We've been faced with similar situations before. *See, e.g.*, *Atain Specialty Ins. Co. v. Henry's Carpet & Interiors, Inc.*, 564 F. Supp. 3d 1265, 1270 (S.D. Fla. 2021) (Altman, J.) ("We note that, on this point, Atain curiously advances only an all-or-nothing proposition—*viz.*, that Henry's isn't entitled to any fees because the declaratory-judgment action was proper when Atain first filed it."); *In re Freedom Unlimited*, 489 F. Supp. 3d 1328, 1332–33 (S.D. Fla. 2020) (Altman, J.) ("Curiously, Freedom elected not to develop these arguments in its motion practice before this Court. In its Response to the Motion to Dismiss [ ], for instance, Freedom staked out the all-or-nothing position that, before a court can

dissolve a Limitation Act injunction, all claimants must stipulate. Freedom (notably) took a similar position in its Objections[.] Strategically, this gamble may well have made sense at the time. After all, if Freedom had succeeded in persuading this Court that Taylor Lane's objection precluded this Court from lifting the injunction, then Freedom could have eliminated Bonn's right to a jury trial. On the other hand, if Freedom had argued only (as it does now) for some limited fact-finding—fact-finding that, as Freedom now claims, must occur before any decision on the injunction's viability—Freedom would have (at best) delayed Bonn's right to proceed in state court." (cleaned up)). And we haven't hesitated, in the face of a party's all-or-nothing abandonment of an argument, to find that the party had forfeited the better (or safer) position. *See Atain*, 564 F. Supp. 3d at 1270 ("Atain's all-or-nothing approach also prevents us from answering a more difficult question: whether an insurer can be absolved of having to pay attorneys' fees for those portions of the declaratory-judgment action that took place before the underlying claimant amended its complaint. . . . Since Atain has waived this more nuanced position, we needn't address it today."); *In re Freedom*, 489 F. Supp. 3d at 1333 ("Either way, to the extent that Freedom hopes, on appeal, to rely on arguments it failed to raise here, its prospects for success look grim."). We see no reason—and Williams certainly hasn't given us any— to take a different approach here. We therefore **GRANT** the Officers' MSJ as to any force they deployed *before* Williams was handcuffed.

But here's the thing: Even if none of this were true—*i.e.*, even if Williams had properly argued that the Officers beat him *before* he was handcuffed—his claims against each officer would still fail on their merits. *See Alcocer v. Mills*, 906 F.3d 944, 952 (11th Cir. 2018) (requiring us to "conduct an individualized analysis of whether each defendant is entitled to qualified immunity"). We'll start with Officer Prince.

### a.  Officer Prince's Use of Force

The parties agree that Officer Mallet punched Williams "five or six" times and kneed him three times in the face. Defs.' SOF ¶ 23; Pltf.'s SOF ¶ 23 ("Undisputed."). But they disagree (or at least they seem to) about Officer Prince's role: The Officers maintain that the only force Officer Prince deployed came when he "redirected Plaintiff to the ground," Defs.' SOF ¶ 17, and then "put his knee on the back of Plaintiff's neck to hold him down," *id.* ¶ 24. And, in his deposition testimony, Williams agreed with this. *See* Williams Dep. at 132:8–16 ("Q: Okay. So the larger officer [Prince] did not punch you or knee you; right? He has – A: No. Q: – the knee in the back? A: He got the knee in my neck. Q: Right. But he's not punching you or kneeing you; correct? A: No. It's the small one [Mallet]."); *see also id.* at 123:13–16 ("They – my face was on the ground like this, and that's when the big one had the neck – knee in my neck, and the little one was just on there, punching and kicking me.").

Despite these clear admissions, Williams has now changed his story (as we've seen, not for the first time) and says that "Prince and Mallet *both* repeatedly struck Palmer Williams." Pltf.'s SOF ¶ 24 (emphasis added). Of course, as is so often the case in Williams's briefing, he cites *no evidence* for this proposition—which is reason enough to disregard it. *Cf. Mack v. Metro. Life Ins. Co.*, 246 F. App'x 594, 598 (11th Cir. 2007) ("[T]o defeat summary judgment [a party] must offer *evidence* from which a jury could reasonably believe [its] arguments." (emphasis added)); *Shenzhen Kinwong Elec. Co. v. Kukreja,* 574 F. Supp. 3d 1191, 1240 (S.D. Fla. Dec. 9, 2021) (Altman, J.) ("[W]e're at summary judgment now, and—after months of discovery—a lawyer's arguments alone won't do the trick."). More importantly, we have no obligation to accept a non-movant's interpretation of the facts when (as here) that interpretation conflicts with the non-movant's *own* testimony. *See, e.g., Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (en banc) ("Our duty to read the record in the nonmovant's favor stops short of *not* crediting the nonmovant's testimony in whole or part: the courts owe a nonmovant no duty to

*disbelieve* his sworn testimony which he chooses to submit for use in the case to be decided." (emphases added)); *id* at 1284 (Carnes, J., concurring, joined by Dubina and Hull, JJ.) ("The good reason is that, absent some extraordinary circumstance, no reasonable jury would believe that a party was lying when he said something harmful to his own case."); *First Mercury Ins. Co. v. Sudderth*, 620 F. App'x 826, 827 (11th Cir. 2015) ("Because Sudderth is the nonmoving party, we must accept her testimony even if other evidence in the record is more favorable on a factual issue than [her] own testimony." (cleaned up)).

And we know that Williams's own testimony contradicts this assertion because Williams separately claims that *Officer Mallet* punched him five or six times and kneed him three times, *see* Pltf.'s SOF ¶ 23, even though he conceded at his deposition that "the five to six punches to the face and the three knees to the cheekbone . . . is *all the use of force* that was used against [him]," Williams Dep. at 147:10–16 (emphasis added). We're not mathematicians here. But, if Williams received five or six punches and three knees—and if Mallet delivered five (or six) punches and three knees—then there are no punches or knees left for Officer Prince. We accept, therefore, Williams's own view (as set out in his deposition testimony), which is that the quantum of force attributable to Officer Prince includes *only* the initial takedown and the pinning of Williams's neck with his knee. Neither constitutes a violation of Williams's constitutional rights.[16]

---

[16] We reiterate that Williams *never argues* in his summary-judgment Response that *either* the takedown *or* the knee pin violated his clearly established rights. *See generally* Response (failing to advance any such argument *or* cite any such cases). In fact, Williams *concedes* that, "[u]nder the facts in this case, Defendants *could* engage Plaintiff and even arguably detain him," *id.* at 8, and he acknowledges that "any threat had been nullified by the lightning quick force used to take Palmer Williams to the ground and handcuff him," *id.* at 7–8. These concessions are, of course, dispositive on any claim that the *takedown itself* violated Williams's rights. Plus, concessions aside, Williams's Response refers to the initial takedown only in passing—and as a kind of prelude to the attack that came after. *See id.* at 6 ("Defendant Prince tackled Mr. Williams to the ground, landing on top of him, handcuffed him, and Defendants Mallet and Prince attacked Palmer so severely they blinded him in one eye and gave him PTSD[.]"); *id.* at 8–9 ("Instead, with guns drawn, [the Officers] rapidly engaged him, did not issue commands, accused him of burglary, and took him to the ground and cuffed him. Then the beating

"[W]hen an officer lawfully arrests[17] an individual for the commission of a crime, no matter how minor the offence, the officer is entitled under controlling Supreme Court precedent to effectuate a full custodial arrest." *Horn v. Barron*, 720 F. App'x 557, 563 (11th Cir. 2018) (cleaned up). "[T]he application of de minimis force, without more, will not support an excessive force claim and will not defeat an officer's qualified immunity." *Ibid.* (cleaned up and citing *Nolin v. Isbell*, 207 F.3d 1253, 1257–58 (11th Cir. 2000)). One example of this kind of lawful, "de minimis force" is "a straight arm bar takedown technique . . . using gravity and [the officer's] own weight to bring [the arrestee] to the ground." *Id.* at 564. In *Horn*, the Eleventh Circuit reversed the district court's decision to deny qualified immunity to an officer who had deployed a straight arm bar takedown, *id.* at 565, holding that this technique did *not* constitute excessive force, *even* when the suspect had been arrested "for a non-serious offense, disorderly conduct," *id.* at 563–64. "Although Horn's crime was not severe," the court explained, "a reasonable officer in Officer Barron's position could think she posed a threat . . . . Although Horn was not disobeying a lawful command when she admittedly pulled her arm away from Officer Barron, a reasonable officer confronted with these facts would be entitled to think that she was resisting and posed a threat of resisting further[.]" *Id.* at 565. Not content to leave things there,

---

began. Viewed through the lens of 11th Circuit law, this was a clearly established violation and excessive force."). Williams has thus "abandon[ed this] claim[.]" *Sappupo*, 739 F.3d at 681; *see also Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented . . . are deemed waived.").

[17] Williams has *never* argued that his arrest was unlawful. He, in fact, has *never* asserted a false-arrest claim. *See generally* Complaint. And, while he obliquely suggests that the "Defendants were simply looking to make an arrest of someone on their proactive patrol and that unlucky someone happened to be Mr. Williams, a black man, in a car, eating, late at night, in a high crime area," Response at 7, he (again) never challenges the lawfulness of that arrest and (notably) cites not a single false-arrest case in his briefing. As we've explained, a party "abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority." *Sappupo*, 739 F.3d at 681; *see also Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented . . . are deemed waived.").

the court added this: "*Even assuming that Horn was totally compliant* with Officer Barron, he was allowed

to use some force in effecting her arrest. And, even if the force applied by Officer Barron in effecting

Horn's arrest—a soft hands, straight arm bar takedown technique, by which he gained control of her

by taking hold of her left arm, putting his right arm over her left arm, and using gravity and his own

weight to bring her to the ground—was unnecessary, it was not unlawful." *Id.* at 564 (emphasis added).

That's precisely what happened here. Officer Prince—on a crime-suppression detail in a high-

crime area in the middle of the night—came upon a man who was sitting halfway into the passenger

side of a parked car. Standing as they were on the side of the road, the Officers were exposed *both* to

oncoming traffic *and* to any dangers posed by the man himself. *See Michigan v. Long*, 463 U.S. 1032,

1047, 1049 (1983) (recognizing that roadside stops are "especially hazardous" and "especially fraught

with danger to police officers"); *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) ("Against this

important interest [officer safety] we are asked to weigh the intrusion into the driver's personal liberty

occasioned not by the initial stop of the vehicle, which was admittedly justified, but by the order to

get out of the car. We think this additional intrusion can only be described as de minimis. . . . What is

at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the

officer's safety."); *see also United States v. Sparks*, 2007 WL 2422126, at *3 (S.D. Ga. Aug. 22, 2007)

(Moore, C.J.) (collecting cases for the proposition that, even during a simple traffic stop, a police

officer "may routinely exercise unquestioned command of the potentially dangerous situation by

ordering both the driver and any passengers to exit their vehicle . . . [because] the legitimate and

weighty interest in officer safety outweigh[s] such a de minimis incremental intrusion upon the driver's

or passenger's liberty interests" (cleaned up)). Suspecting the man of committing a burglary—arguably

a more dangerous setting than most traffic violations—Officer Prince ordered him out of the car and,

to ensure compliance and to guarantee the Officers' safety, took him down to the ground. Officer

Prince then kept his knee on Williams's neck until he was fully handcuffed. *See* Defs.' SOF ¶ 22 ("To

gain control over Plaintiff, Officer Prince put his knee on the back of Plaintiff's neck to hold him down."); Pltf.'s SOF ¶ 22 ("Undisputed."); Williams Dep. 131:20–21 ("They had me in my neck – put me – the big one, knee is in my neck."); *see also* Body Cam Footage at 1:07, 1:31, 1:43 (Williams's own girlfriend and friend imploring him to "stop resisting"); Body Cam Footage at 0:43, 0:51, 1:05, 1:30, 1:42, 1:54, 2:43, 2:51, 3:05 (Officers telling Williams to stop resisting). *Horn* thus supports the Officers' view that Officer Prince's conduct was not unconstitutional.

*Nolin* likewise supports Officer Prince. In that case, the Eleventh Circuit found an officer's use of force de minimis where, during a lawful arrest, he "grabbed [the arrestee] from behind by the shoulder and wrist, threw him against a van three or four feet away, kneed him in the back and pushed his head into the side of the van, searched his groin area in an uncomfortable manner, and handcuffed him." *Nolin*, 207 F.3d at 1255. If anything, the quantum of force the officer deployed in *Nolin* was materially greater than what we have here. Officer Prince, after all, didn't throw Williams against the side of a car, he didn't push Williams's head into the side of a van, and he didn't search his groin in an uncomfortable (read: painful) manner. *Nolin*, then, further bolsters Officer Prince's request for qualified immunity.

Finally, while the Eleventh Circuit was "skeptical" in *Croom v. Balkwill* "that the force alleged was truly necessary under the circumstances," the court could "not find a constitutional violation based on . . . Deputy Graham pushing Croom to the ground from her squatting position and holding her there with a foot (or knee) in the back for up to ten minutes[.]" 645 F.3d 1240, 1252–53 (11th Cir. 2011). The court came to this conclusion *even though* Croom *wasn't* under arrest and *wasn't* suspected of any crime *at all*. She was simply at the wrong place at the wrong time—in the front yard of a suspected drug house during the execution of a search warrant. *See id.* at 1244–45 ("Croom . . . returned outside to resume watering the plants. Crockett testified during his deposition that Croom 'didn't seem to pose any risk at all.'").

Taken together, these cases support our view that Officer Prince's decision to take Williams to the ground and then, while Williams remained uncuffed, to hold him there with his knee was de minimis and (thus) didn't violate Williams's constitutional rights. In other words, *even if* Williams hadn't forfeited the argument that Officer Prince used excessive force *before* handcuffing him—and, to be clear, he *has* forfeited that argument—we'd reject that claim on the merits.[18]

### b. Officer Mallet's Use of Force

Williams never argues that Officer Mallet used *any* force against him *before* he was handcuffed. *See* Response at 8–9 ("Instead, with guns drawn, [they] rapidly engaged him, did not issue commands, accused him of burglary, and took him to the ground and cuffed him. . . . *Then* the beating began." (emphasis added)). On this at least, Williams has remained consistent: At his deposition, after all, he *explicitly denied* that Officer Mallet had punched or kicked him *before* he was handcuffed. Here's how that part of the deposition went down:

> Q: So basically it – was it a split second from the time you were on the ground and the handcuffs were both on?
> A: Yes, both of them on when I'm on the ground.
> Q: Okay, And what happens next?
> A: They had me in my neck – put me – the big one, knee is in my neck. The other on the ground punching me, punching me, punching me. I don't know why he punching me and kicking me, kneeing me in my face.
> Q: Okay. So he – how many times did the smaller officer, as you call him, punch you in the face?

---

[18] Williams elsewhere suggests that, "rather than engage the Plaintiff in a consensual encounter, they rushed him with guns drawn, accused him of a burglary rather than conduct any inquiry, and immediately engaged him physically without providing commands to submit to being detained or arrested . . . and without giving Mr. Williams an opportunity to comply[.]" Response at 5; *see also id.* at 8 ("Under the facts in this case, Defendants could engage Plaintiff and even arguably detain him, as he was out in public at the time of the incident. If they did indeed need to engage or detain him, they could have engaged him in a conversation first to gauge compliance, they could have ordered him to submit to being detained and they could have given him a chance to comply."). But he never argues that the Officers' failure to warn him—or to engage him before taking him to the ground—constituted excessive force. Nor does he cite any cases for that proposition. In these circumstances, he's (again) forfeited any such argument. *See, e.g., Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue waives it.").

> A: I'd say about five or six times. Kneed me about three times in the face. All of this here was tore up, up under my eye. Everything was –
> . . . .
> Q: About how long – you said it was five to six times that you were punched in the face and three – and about three times that you were kneed, and that all of that occurred while you had your handcuffs on?
> A: Yes.
> . . . .
> A: Yes. When he – when he – when they handcuff me, that when the small officer started punching me and kicking me – I mean, kneeing me.

Williams Dep. at 131:15–132:3, 133:25–134:14. Not content to leave things there, the Officers' lawyer went back one more time to confirm what Williams was saying:

> Q: Okay. I understand so far the use of force to be the five to six times the officers punched you in the face and the three times the officer kneed you in the eye; is that correct?
> A: Punched me in my eye, kneed me in my chin bone.
> . . . .
> Q: Am I missing any other use of force up to this point?
> A: That was it.
> Q: Okay. Am I missing – have you completely described to me everything the officer said or did to you up to this point?
> A: Yes, ma'am.

*Id.* at 136:23–137:11.

These questions and answers confirm three crucial pieces of information: (1) that the smaller Officer (Mallet) punched Williams five or six times and kneed him three times; (2) that *all* of those blows came *after* Williams was handcuffed; and (3) that the Officers didn't use *any other force* against him. Williams's own testimony, therefore, forecloses any argument that Officer Mallet deployed force (let alone excessive force) *before* Williams was handcuffed.

***

For two independent reasons, therefore, Williams cannot survive summary judgment on any claim that the Officers used excessive force *before* he was handcuffed. *First*, he's forfeited any such claim by failing to advance it in his Response. *Second*, and in any event, Williams's own testimony forecloses any claim that *either* officer used excessive force against him before he was handcuffed. We

32

therefore **GRANT** the Defendants' MSJ as to any claim that the Officers deployed excessive force *before* Williams was handcuffed.[19]

### C.  Failure to Intervene

Having found that neither officer deployed excessive force against Williams, we now also grant judgment for the Officers on Williams's failure-to-intervene claims. "[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable for his nonfeasance." *Skrtich v. Thornton*, 280 F.3d 1295, 1302 (11th Cir. 2002). That said, "[a]n officer's duty to intervene is triggered when he sees a fellow officer *use excessive force*." *Callwood v. Jones*, 727 F. App'x 552, 560 (11th Cir. 2018) (emphasis added). In other words, when an officer "observed no use of excessive force which might have given rise to a duty to intervene to stop it," the officer is under no duty to intervene. *Riley v. Newton*, 94 F.3d 632, 635 (11th Cir. 1996). Because Williams has failed to create a genuine dispute of material fact on the claim that either officer deployed excessive force against him, we **GRANT** the MSJ on his failure-to-intervene claims (Counts III and IV).

### CONCLUSION

"Police officers are often called upon to make split-second judgments 'in circumstances that are tense, uncertain, and rapidly-evolving,' and the typical arrest involves some force and injury." *Horn*, 720 F. App'x at 565 (quoting *Kingsley*, 576 U.S. at 399). Reasonable minds may differ about the extent to which the Officers' use of force was necessary in the circumstances of our case. But "a court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer." *Kingsley*, 576 U.S. at 399. With that proper perspective in mind—and given the

---

[19] Since Williams has failed to create a genuine dispute of material fact on his claim that the Officers violated his constitutional rights, we needn't (and won't) reach the separate question of whether the right at issue here was clearly established.

arguments Williams *elected* to make before this Court—we have little choice but to grant the Officers' MSJ.

***

After careful review, we hereby **ORDER AND ADJUDGE** as follows:

1. The Officers' Motion for Summary Judgment [ECF No. 39] is **GRANTED**.

2. Pursuant to FED. R. CIV. P. 58, we'll enter final judgment separately.

3. This case shall remain **CLOSED**. All hearings and deadlines are **TERMINATED**, and any pending motions are **DENIED as moot**.

**DONE AND ORDERED** in the Southern District of Florida on December 18, 2023.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record